**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

GREGG BOCHAT, and PHILIP SIMONS
on behalf of themselves and all others
similarly situated,

                Plaintiffs,

      v.

AMBIT ILLINOIS, LLC, VISTRA CORP,
and VOLT ASSET COMPANY, INC.,

          Defendants.

Case No. 1:24-cv-3116

Hon. Manish S. Shah

JURY TRIAL DEMANDED

## PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT

Plaintiffs Gregg Bochat and Philip Simons ("Plaintiffs")[1], on behalf of themselves and all

persons similarly situated, by and through their attorneys, allege the following with knowledge as

to their own acts, and upon information and belief as to all other acts.

## OVERVIEW OF AMBIT'S BAD FAITH PRACTICES

1.      Seizing on the nation's push to deregulate retail energy markets and provide

consumers with alternatives to traditional utilities, independent energy companies like Ambit

Energy have grown rapidly.

2.      Founded in 2006, Ambit Energy is one of the nation's largest independent energy

suppliers. Based in Dallas, Texas, Ambit serves over 1 million electric and natural gas customers,

---

[1] Plaintiffs filed their original Class Action Complaint in the Circuit Court for Cook County,
Illinois. Defendants subsequently removed the action to the United States District Court for the
Northern District of Illinois.

94% of whom are residential customers like Plaintiffs.[2]

3.      **The "1% Savings Guarantee"** – Ambit markets itself as a less-expensive alternative to existing utilities; after all, because Ambit sells the exact same energy as existing utilities customers have no reason to switch to Ambit other than to save money.  To that end, during the time-period relevant to this litigation, Ambit offered its Illinois consumers a supposedly sure thing: guaranteed savings compared to what their existing utility charges.  Ambit called this offer the "Guaranteed Savings Plan."  Under this Plan, Ambit promised that its customers' 12-month energy costs would be at least 1% less than what the customers' existing utility (the "incumbent provider") would have charged, or Ambit would make up the difference.  Ambit sold these savings as the Guaranteed Savings Plan.

4.      For Example, Ambit's co-founders Jere W. Thompson and Chris Chambless made Illinois consumers the following written guarantee:

---

[2]As discussed *infra* at 9-10, Ambit Energy, including Defendant Ambit Illinois, LLC, was purchased by Defendants Volt Asset Company, Inc. and Vistra Corp. in 2019.  Defendants are hereafter collectively referred to as "Ambit Energy," or "Ambit," unless otherwise specified.



5.      **Ambit's Terms of Service –** Ambit imposes on its customers a standard, non-negotiable, and uniform customer contract.[3]   The agreement in use when Plaintiff Simons signed up with Ambit in 2009 provided that "[b]y choosing Ambit Energy, you are guaranteed an annual savings of one percent (1%) less than the incumbent utility's published supply rate for the same 12-month period that you received power from Ambit Energy under this Agreement."[4] Exhibit A at 1 (the "Guaranteed Savings Contract").  The Guaranteed Savings Contract continued, "[i]f you did not save at least 1% over the incumbent utility's published gas rate, we will send you a check for the difference."  *Id.*; *see also* Exhibit B at 1 (identical language).

---

[3] Upon information and belief, the Agreement in use when Plaintiff Simons signed up with Ambit in 2009 is attached hereto as **Exhibit A**.  Upon information and belief, the Agreement in use when Plaintiff Bochat signed up with Ambit in 2010 is attached hereto as **Exhibit B**.

[4] The 2010 version in effect when Plaintiff Bochat contains an identical commitment: "[b]y choosing the Guaranteed Savings Plan – Natural Gas, you are guaranteed an annual savings of one percent (1%) less than the incumbent utility's published supply rate for the same 12-month period that you received power from Ambit Energy under this Agreement."  Exhibit B at 1.

6.      The Guaranteed Savings Contract's "Amendments" section limits Ambit's ability to change this guaranteed contract: "Ambit reserves the right to amend or terminate this Agreement due to changes in regulatory rules and requirements, any and all applicable laws, or Nicor's Customer Select tariff." Exhibit A at 2; *see also* Exhibit B at 2 (identical language). This section also states that "[i]f Ambit materially changes the provisions of this Agreement to the disadvantage of the Customer, Ambit Energy will provide 45 days notice prior to the effective date of such material change and provide the customer with 45 days to opt out of the new provisions at no cost, beginning on the postmarked date of the material change notice sent by Ambit Energy to the Customer." Exhibit A at 2; *see also* Exhibit B at 2 (identical language)

7.      **Ambit's Automatic Default Policy** – Beginning in January 2012, and without adequate warning, Ambit purported to amend the Guaranteed Savings Contract to eliminate the supposed benefits of the 1% Savings Guarantee. Under this new policy, Ambit created a more expensive plan called the Illinois Select Variable Plan and began automatically shifting Guaranteed Savings Plan customers onto the Illinois Select Variable Plan (hereafter the "Variable Plan").[5] Prior to 2012, customers like Plaintiffs who were enrolled in the Guaranteed Savings Plan were promised they could remain on the plan and keep their 1% Savings Guarantee as long as they stayed with Ambit. Exhibits A and B at 1.

8.      After it instituted its automatic default policy, however, Ambit only honored its Guaranteed Savings Plan promise if customers like Plaintiffs actively notified Ambit of their intention to stay in the Guaranteed Savings Plan. Thus, like Plaintiffs, thousands of Ambit's Illinois customers were automatically defaulted into the more expensive Variable Plan in direct

---

[5] Attached hereto as **<u>Exhibit C</u>** is a copy of the customer contract upon which Ambit based its automatic default policy.

contravention of Ambit's Guaranteed Savings promise.

9.     The Illinois Select Variable Plan is "select" only insofar as Ambit used it to select Guaranteed Savings Plan customers for higher energy rates.  When Ambit implemented the Variable Plan, new customers at the time could not sign up for the Variable Plan directly with Ambit, and Ambit neither advertised nor offered the Variable Plan in its marketing materials or on its website.  Ambit's automatic default policy was the only way an existing Guaranteed Savings Contract customer could become a member of the Variable Plan.

10.     As a result of being automatically defaulted, Plaintiffs lost their 1% Savings Guarantee, and due to the higher rates charged under the Variable Plan, they paid Ambit substantially more than they would have under the Guaranteed Savings Plan, because the Variable Plan rates are always much higher than the local utility rates.  After defaulting Plaintiffs into the Variable Plan, Ambit overcharged them until they cancelled their service with Ambit.  Ambit breached the Guaranteed Savings Contract every year by failing to write checks to its customers on the Guaranteed Savings Plan for the difference between Ambit's variable rate and 1% less than what the utility would have charged.

11.     The new amended contract purporting to materially change the Guaranteed Savings Contract was never in effect but was instead a legal nullity and *void ab initio*.  The Guaranteed Savings Contract could only be terminated for "changes in regulatory rules and requirements, any and all applicable laws, or Nicor's Customer Select tariff."  There were no such changes.

12.     Nor was Ambit's bad faith attempt to amend the Guaranteed Savings Contract effective.  Ambit did not provide Illinois customers a meaningful opportunity to "opt out of the new provisions at no cost," and it failed to send the "material change notice" required by the Agreement.  Instead, Ambit sent Plaintiffs and the Class inconspicuous mailers that did not explain

the reason for Ambit's purported amendment or even that the Guaranteed Savings Contract was being changed, did not afford customers the opportunity to opt out at no cost or otherwise, and did not even contain the words "material change."

13.     There can be no dispute that the amendment requiring customers to affirmatively renew the Guaranteed Savings Plan was a material change requiring 45 days prior notice and the opportunity to opt out.  Absent the purported amendment, customers could comfortably sit back and know that they did not have to take any action to be sure that they saved money compared to utility rates.  After all, that was what Ambit promised.

14.     Ambit knew that the purported amendment would be material because it estimated that 65% of its customers would not send written notice for renewal, resulting in tens of millions of dollars in additional payments to Ambit for the same exact commodity (gas and electricity). Given that the Variable Plan was much higher than the utility rates, much less 1% lower than utility rates, the new unauthorized "amendment" resulted in materially increased rates for a significant majority of customers on the Guaranteed Savings Contract.

15.     Moreover, as set forth below, Ambit breached its implied duty of good faith and fair dealing by using the automatic default policy as a tool for extracting exorbitant energy charges from its unsuspecting customers.  Indeed, when then Ambit Co-CEO Chris Chambless was asked under oath about Ambit's reasons for implementing the automatic default policy during a deposition, he gave a nonsensical answer which demonstrates (a) that Ambit did not change its contract because of "changes in regulatory rules and requirements, any and all applicable laws, or Nicor's Customer Select tariff" and (b) that the change to the Agreement was made in bad faith:

> Q:  Now, you mentioned that one of the reasons for switching to a 1-percent guarantee renewal requirement was in order to make sure that the customers stay with Ambit, right?

A: Well, our thought process is, it gave us an opportunity to talk to them once a year and that if they proactively acknowledge that they had to stay for 12 months to receive that savings guarantee, they might possibly stay longer.

[. . . .]

Q: And what analyses, if any, has Ambit done in order to determine whether customers are more likely to stay as customers if they contact Ambit in order to renew their Guaranteed Savings Plan?

A: I don't know that we've done anything specifically. I think it was just – you know, our idea was that, when you ask a person to proactively say, yes, I want to be here for 12 months, intuitively they're going to stay around longer than someone who didn't say that or do that. I don't know that we've done any specific studies to prove that theory out. It was my theory at the time.

*Kostovetsky vs. Ambit Energy Holdings, LLC., et al.*, No. 15 Civ. 2553, ECF No. 100-25 at 95:7-96:14 (N.D. Ill.)

16.     The Co-CEO's sworn testimony underscores Ambit's breach of the Agreement. Ambit's customers are of course *Ambit's* customers, Ambit can "talk to them" whenever they want and more than "once a year" if Ambit chooses. Further, taking away a previously promised guarantee of savings is not going to make customers "possibly stay longer." No consumer would elect to opt-into the Guaranteed Savings Plan once a year when previously the customer's option was to simply stay with Ambit and receive a savings guarantee compared to what their utility would have charged.

17.     Ambit's decision to purportedly require customers to opt into the Guaranteed Savings Plan to keep it was clearly designed in bad faith to assure that the overwhelming majority of Ambit's customers would be shifted to the Variable Plan. Indeed, the mailers containing the alleged terms of service were designed to ensure that customers did not read or notice the renewal term or the amended Agreement.

18.     It is well-established that defaults are powerful drivers of consumer behavior. There are various factors underlying this human tendency that have been discussed in the judgment and

decision-making literature, such as the work about defaults, the "status quo bias,"[6] and "Nudges."[7]

19.      In this case, Ambit knew that once it had the consumer switched to the Variable Plan it could charge high energy rates and many consumers (if not most) would simply unknowingly pay the exorbitant charges.

20.      Ambit's cynical exploitation of consumer inertia is further exacerbated by the fact that it is extremely difficult for consumers, including Plaintiffs, to compare Ambit's prices with what their local utility would have charged.  No consumer, including Plaintiffs, would know, even through the exercise of due diligence, that Ambit charged them more than 1% less than the utility rates over the course of any particular year.

21.      Although Ambit well knew that its customers were counting on Ambit's promise of guaranteed savings, Ambit's purported amendment was intended to remove customers from the Guaranteed Savings Plan.  Ambit's purported amendments to its Agreement were intended to deprive its customers of the benefits Ambit previously told them they would receive under the Agreement and which they had a reasonable expectation of receiving.

22.      Only through a class action can Illinois customers remedy Ambit's ongoing wrongdoing.  Because the monetary damages suffered by each consumer are small compared to the much higher cost a single customer would incur in trying to challenge Ambit's improper practices, it makes no financial sense for an individual customer to bring his or her own lawsuit.  Further, many customers don't even realize they are victims of Ambit's bad faith conduct.

23.      With this class action, Plaintiffs and the Class seek to level the playing field and

---

[6] Daniel Kahneman, Jack L. Knetsch and Richard H. Thaler (1991), "Endowment Effect, Loss Aversion, and Status Quo Bias," *The Journal of Economic Perspectives*, Vol. 5, pp. 193–206.

[7] R. Thaler and S. Sunstein (2008), *Nudge*, Yale University Press.

make sure that companies like Ambit engage in fair and upright business practices. Plaintiffs therefore seek equitable relief in addition to monetary damages. Plaintiffs ask that the Court declare Defendants' business practices impermissible, enjoin Defendants from continuing their dishonest practices, and compensate Plaintiffs and the Class for all damages suffered as a result of Defendants' breaches of contract.

## **PARTIES**

24.     Plaintiff Gregg Bochat is a citizen and resident of Illinois residing in Crystal Lake, Illinois at all relevant times.

25.     Upon information and belief, Mr. Bochat signed up with Ambit Energy in 2010 and began purchasing his natural gas from Ambit in September 2010.

26.     In January of 2012, in contravention of the Guaranteed Savings Contract, Mr. Bochat was changed without contractual authorization of his consent or knowledge from the Guaranteed Savings Plan to the Variable Plan. Ambit never paid Mr. Bochat for the difference between the rates Ambit charged and 1% less than the utility would have charged. In January of 2015, Mr. Bochat canceled his service with Ambit.

27.     Plaintiff Philip Simons is a citizen and resident of Illinois residing in Skokie, Illinois at all relevant times.

28.     Upon information and belief, Mr. Simons signed up with Ambit in 2009 and began purchasing his natural gas from Ambit in July 2009.

29.     In July 2012, in contravention of the Guaranteed Savings Contract, Mr. Simons was changed without contractual authorization of his consent or knowledge from the Guaranteed Savings Plan to the Variable Plan.

30.     Mr. Simons canceled his Ambit service in March of 2022.

*Defendants*

31.     On November 1, 2019, Defendant Volt Asset Company, Inc., an indirect, wholly owned subsidiary of Defendant Vistra Corp. ("Vistra"), purchased Ambit Energy, including Defendant Ambit Illinois, LLC.[8]

32.     Vistra is a Delaware corporation with its principal place of business in Irving, Texas.  Vistra is a Fortune 500 energy company.

33.     Defendant Volt Asset Company, Inc. ("Volt") is a wholly-owned indirect subsidiary of Vistra.[9]  Volt is a Delaware corporation with its principal place of business in Austin, Texas.  On information and belief—and as its name suggests—Volt is merely a pass-through holding company through which Vistra owns Ambit Illinois, LLC.[10]  Volt's mailing address on file with the Texas Comptroller of Public Accounts is also listed as a "Registered Office" of Vistra. Volt has no website and, on information belief, has no employees of its own.

34.     Defendant Ambit Illinois, LLC is an Illinois limited liability company with its principal place of business in Irving, Texas.  Illinois customers' initial contract with Ambit was with a Texas limited partnership called Ambit Energy LP.  At some point in 2010, Ambit Illinois, LLC was substituted as the contracting party for Illinois customers in place of Ambit Energy LP. On information and belief, Ambit Energy LP dissolved in or around 2010 or 2011.  On information

---

[8] *See* "Ambit Transaction," Acquisitions, Merger Transaction and Business Combination Accounting (Notes), SEC ARCHIVE, *available at* https://www.sec.gov/Archives/edgar/data/1692819/000169281921000004/R10.htm.

[9] *Id.*

[10] *See id.* ("*Vistra* funded the purchase price of $555 million [for Ambit] . . . using cash on hand." (emphasis added)); *id.* ("We believe the Ambit Transaction has (i) augmented *Vistra's* existing retail marketing capabilities . . . . (emphasis added)).

and belief, Defendant Ambit Illinois, LLC is the successor in interest to Ambit Energy, LP which is the entity that was first permitted to sell and distribute energy under the name "Ambit Energy" to Illinois customers. On information and belief Ambit Energy LP assigned its customer contracts to Ambit Illinois, LLC. On information and belief, Defendant Ambit Illinois, LLC is wholly-owned by Vistra through Volt.

35. Upon information and belief, Vistra completely controls its operating affiliates, including Volt and Ambit Illinois, LLC. Although Defendants market Ambit Energy as a standalone brand,[11] public data show that Ambit is a mere alter ego of Vistra. For example, according to the Illinois Secretary of State, the "principal address" for Ambit Illinois, LLC is 6555 Sierra Dr., Irving, TX 75039—the address of Vistra's corporate headquarters.[12] On information and belief, Ambit Illinois, LLC has no separate offices.

36. Further, on information and belief, there is a unified executive team that controls all operational and financial aspects of Vistra and its subsidiaries, including Volt and Ambit Illinois, LLC. On information and belief, Ambit Illinois, LLC has no employees of its own. Indeed, the "Careers" page on the Ambit Energy website redirects to a Vistra careers site.[13] A LinkedIn search for "Ambit Illinois" on March 13, 2024 returned zero results.

37. Since its acquisition of Ambit Energy in 2019, Vistra has continually used Ambit Illinois to conduct the challenged actions in this litigation.

---

[11] *See, e.g.*, "About Ambit Energy," AMBIT ENERGY, https://ambitenergy.com/about-ambit-energy.

[12] *See* "Corporate Headquarters," Operations, VISTRA CORP., https://vistracorp.com/operations/.

[13] *See* Careers at Ambit Energy, AMBIT ENERGY, https://www.ambitenergy.com/careers-at-ambit-energy.

## JURISDICTION AND VENUE

**I.      Subject Matter Jurisdiction**

38.     This Court has jurisdiction over Defendants pursuant to 735 ILCS 5/2-209. Plaintiffs are residents of the state of Illinois and Defendant Ambit Illinois, LLC is a citizen of Illinois.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) & 1367 because: (i) this is a class action in which the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs; (ii) there are 100 or more class members; and (iii) some members of the class are citizens of states different from some Defendants.

**II.     Personal Jurisdiction**

39.     This Court has personal jurisdiction over Defendants because the wrongful conduct giving rise to this case occurred in, was directed to, and/or emanated from Illinois and specifically this District.

40.      This Court has specific personal jurisdiction over all Defendants because each Defendant maintains sufficient contacts in this jurisdiction, including the advertising, marketing, distribution and sale of natural gas and electricity to Illinois consumers.

41.     Defendant Ambit Illinois, LLC is the successor in interest to Ambit Energy, LP, which is the entity that was first permitted to sell and distribute energy under the name "Ambit Energy" to Illinois consumers.  Ambit Energy, LP marketed directly to Illinois consumers, and issued Illinois consumers the savings guarantee described earlier in this Complaint.

**III.    Venue**

42.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts or omissions giving rise to the claims alleged herein occurred in Illinois. Alternatively,

venue is proper under 28 U.S.C. § 1391(b)(3) because this Court has personal jurisdiction over Defendants.

## FACTUAL ALLEGATIONS

**I.      The Deregulation Of The Illinois Energy Markets**

43.      In 1997, Illinois deregulated the sale of retail gas and electricity.  As a result of deregulation, Illinois consumers can purchase natural gas and/or electricity through third-party suppliers while continuing to receive delivery of the energy from their existing public utilities. These third-party energy suppliers are known in Illinois as Alternative Gas Suppliers ("AGS") and Alternative Retail Electric Suppliers ("ARES").  Since Illinois opened its retail gas and electric markets to competition, more than 3 million Illinois consumers have switched to an ARES or AGS.

44.      An AGS or ARES is subject to minimal regulation by Illinois's utility regulator, the Illinois Commerce Commission.  Companies like Ambit do not have to file their rates, or the method by which those rates are set, with the Commission.

45.      If a customer switches to an AGS or ARES, the customer will then have their energy "supplied" by the company, but still "delivered" by their existing utility.  The customer's existing utility continues to bill the customer for both the energy supply and delivery costs.  The only difference to the customer is which company sets the price for the customer's energy supply.

46.      After a customer switches to an AGS or ARES, the customer's energy supply charge, based either on a customer's kilowatt hour (electricity) or therm (gas) usage, is calculated using the supply rate charged by the company and not the customer's former utility.  The supply rate charged is itemized on the customer's bill as the number of kilowatt hours ("kWh") or therms multiplied by the rate.  For example, if a customer uses 100 therms at a rate of $0.50 per therm, the customer will be billed $50.00 (100 x $0.50) for their energy supply.

## II.    Ambit's Bad Faith Automatic Default Policy

47.    In 2012, Ambit implemented a policy designed to dishonor its obligations under the Guaranteed Savings Contract and to increase the energy rates of its customers.  Despite Ambit's pledge that consumers who switch to Ambit will have the peace of mind of knowing that they are guaranteed "an annual savings of at least 1% over the incumbent utilities' published" gas rate, and in direct contravention of the plain terms of the Guaranteed Savings Contract, Ambit switched Plaintiffs and other customers to the more costly Illinois Select Variable Natural Gas Plan (which has no guaranteed savings) and started requiring that customers take action once every 12 months to hold on to their guarantee.  Ambit's new policy requires customers to actively renew their participation in the Guaranteed Savings Plan on or before the anniversary that they joined Ambit, otherwise they will be automatically defaulted into the Variable Plan.

48.    The Variable Plan has no purpose other than to allow Ambit to dishonor its 1% Savings Guarantee.  Indeed, the only Guaranteed Savings Plan customers who end up in the Variable Plan are those Ambit automatically defaults out of the Guaranteed Savings Plan.

49.    When Ambit added the automatic default policy to its Agreement in 2012, Ambit failed to adequately notify Plaintiffs and other Guaranteed Savings Plan customers they were subject to the new default policy and that it was purporting to materially amend or replace the Guaranteed Savings Contract.

50.    The experiences of Ambit Guaranteed Savings Plan customers who complain online are emblematic of Ambit's ongoing bad faith practice of automatically defaulting customers into the higher costing variable plan.  As one customer explained:

> I've been using Ambit Energy for two years. I started with Ambit in 2016. The rule is after a year on your contract you would have to renew it into the plan you have always been in. **What they didn't tell me is if they send a notice to renew and it is not caught on time, they will automatically renew**

**you into their highest variable rate without notice. So, I received my electricity bill and my bill went from $97.00 to $285.00 for one month!** After I called to discuss this with Ambit, they told me they have the right to change the plan over at their discretion after a year has passed. Here is the sneaky part, they will change over to the highest rated plan because they told me that most people don't want to mess around with renewing their contracts. I am furious about this.

This is a SCAM and it is written all over the program. They absolutely should not enroll you in the most expensive plan there is for THEIR benefit. They are making thousands and thousands of dollars doing this. There is no person in their right mind who would want Ambit to move them into a higher cost plan that quadruples! The frustrating part is I don't know who to complain to and I'm switching from Ambit immediately. I don't know if I have any way to get a refund. Of course if I don't pay it, ComEd will disconnect me. So they have me against a wall with their sneaky business practices. Perhaps the Attorney General's office can help. I just don't know. And they lured me in with their travel reward program, which has now abruptly ended. I WOULD NOT USE AMBIT AND ANYONE WHO READS THIS, PLEASE DO NOT CHOOSE AMBIT.[14]

In the words of another customer, Ambit uses

[s]hady business practices. They prey on folks who fail to renew their contracts. My rate went from .0675 to .012375 after my guaranteed savings plan ended. They claim I should have received a notification about renewing. Never saw it. What kind of people would charge you double the average national rate. Thieves, scam artist, liars. Pure evil. Please don't make the same mistake I did.[15]

And a third customer issued the following warning:

Horrible customer service! Stay away! Got me on a plan for 3 cents/kwh then a few months later went up to 19.5!!!! Found out after they drafted my bank account over $870.00. Called twice on 2 separate days waiting on hold over an hour to remedy this and no one answered! Called a third time and left my phone number to call back when my turn came up and no one called! But if you want to sign up for a new service you get immediately taken care of! I had to switch to a different company and still charged me $199 after I explained my experience with them! All I got was "sorry"!!![16]

---

[14] *Available at* https://www.consumeraffairs.com/utilities/ambit.html (emphasis added).

[15] *Id.*

[16] *Id.*

51.     Ambit lulled customers into thinking that once they signed up for the Guaranteed Savings Plan they would be on the plan as long as they are customers. Ambit's existing Guaranteed Savings Plan customers were given no reason to suspect that they would automatically become participants in the Variable Plan if they failed to take further action.

52.     During the time they were in the Variable Plan, Plaintiffs paid Ambit far more than they would have been charged by NICOR (their incumbent utility).

53.     By moving Plaintiffs into the higher costing Variable Plan, Ambit cheated Plaintiffs out of the 1% savings they were guaranteed as participants in the Guaranteed Savings Plan.

**III.    Ambit Breaches Its Customer Contracts By Not Paying Customers For The Difference Between Ambit's Rates And 1% Less Than The Utility Rate.**

54.     Ambit did not have the right to terminate the Guaranteed Savings Contract. That agreement stated that "Ambit reserves the right to amend or terminate this Agreement due to changes in regulatory rules and requirements, and all applicable laws, or Nicor's Customer Select tariff." No such changes occurred.

55.     In 2012, Ambit sent a document to its customers which it now claims was a new, amended contract which contained the automatic default provision. This amendment was clearly not made "due to changes in regulatory rules and requirements . . . applicable law, or Nicor's Customer Select tariff." In the 2016 deposition in *Kostovetsky v. Ambit Energy Holdings, et al.* referenced above and discussed further below, Ambit's Co-CEO admitted to this fact.

56.     Ambit's 2010 Agreement also stated the following:

If Ambit materially changes the provisions of this Agreement to the disadvantage of the Customer, Ambit Energy will provide 45 days notice prior to the effective date of such material change and provide the customer with 45 days to opt out of the new provisions at no cost, beginning on the postmarked date of the material change notice sent by Ambit Energy to the Customer. If the customer does not respond to the material change notice within the 45 days to notify Ambit Energy that it elects to opt out of this Agreement within the Customer opt out time period, this Agreement will

continue in effect under the amended terms of service.

57.     Ambit did not comply with this provision in connection with its purportedly new materially amended contract that contained the automatic default provisions because Ambit failed to provide customers with a "material change notice" 45 days prior to implementing the automatic default policy in 2012.   Instead, in mid-2012 Ambit sent its customers inconspicuous mailers enclosing the amended Agreement.   The mailer appeared as junk mail and its contents did not mention either 1) a "material change" being made to Ambit's Agreement, or 2) customers having an opportunity to opt out of being defaulted into a more expensive plan.   Nor did Ambit provide customers with an opt-out mechanism.   Rather, the inconspicuous mailer that Plaintiffs received simply stated that new or updated terms of service were enclosed.   The mailer did not even contain the words "change" or "amendment," much less "notice of a material change."

58.     Moreover, the automatic default provision is buried in small print within the three-page unauthorized terms of service without any highlights in the three-page form contract.   No special boxes, colors, or font sizes set off the limited description of the Variable Plan or the automatic default provision.

59.     In other words, Ambit did everything it could to ensure that its customers did not in fact notice that it was attempting to deprive them of the core benefit of the Guaranteed Savings Contract by instituting the automatic default policy.   Ambit's "notice" was in bad faith and not at all reasonable.

60.     There can be no dispute that Plaintiffs were damaged by Ambit's bad faith refusal to honor the Guaranteed Savings Contract.   The table below, which catalogues the difference in supply charges between Mr. Bochat's utility, NICOR, and Ambit, demonstrates the significant overcharges under the Variable Plan.

| Date | NICOR Charge | Ambit Charge | Difference |
|---|---|---|---|
| 02/2013 | $58.71 | $62.03 | $3.32 |
| 03/2013 | $86.39 | $92.56 | $6.17 |
| 04/2013 | $47.75 | $50.90 | $3.15 |
| 05/2013 | $48.23 | $51.14 | $2.91 |
| 06/2013 | $35.00 | $36.22 | $1.22 |
| 07/2013 | $46.23 | $48.24 | $2.02 |
| 08/2013 | $26.27 | $28.67 | $2.40 |
| 09/2013 | $37.87 | $39.98 | $2.11 |
| 10/2013 | $19.79 | $21.04 | $1.25 |
| 11/2013 | $14.29 | $15.03 | $0.74 |
| 12/2013 | $48.46 | $50.69 | $2.23 |
| 01/2014 | $75.89 | $80.34 | $4.45 |
| 02/2014 | $78.36 | $81.83 | $3.47 |
| 03/2014 | $133.69 | $210.73 | $77.04 |
| 04/2014 | $79.15 | $102.84 | $23.69 |
| 05/2014 | $54.20 | $81.46 | $27.26 |
| 06/2014 | $53.51 | $80.42 | $26.91 |
| 07/2014 | $111.19 | $167.12 | $55.93 |
| 08/2014 | $44.47 | $66.84 | $22.37 |
| 09/2014 | $50.08 | $75.27 | $25.19 |
| 10/2014 | $32.58 | $67.95 | $35.37 |
| 11/2014 | $23.96 | $53.78 | $29.82 |
| 12/2014 | $61.30 | $141.4 | $80.11 |

| Date | NICOR Charge | Ambit Charge | Difference |
|------|-------------|--------------|------------|
| 1/2015 | $82.95 | $179.65 | $96.70 |

61.     Within a little over a year, Mr. Bochat's monthly charges for gas jumped ***significantly***. Over the final ten months of Mr. Bochat's Ambit gas service, Ambit charged $40 per month more than the utility (NICOR), on average.   These extra charges over the course of 24 months totaled $535.82.  Because Ambit promised to charge 1% less than the utility, Mr. Bochat's damages were $541.18.

62.     Mr. Simons's bills for the last 21 months he was an Ambit customer also demonstrate the significantly higher amounts per therm Ambit charged on the Variable Plan as compared to what Mr. Simon's utility (NICOR) would have charged.

| Date | NICOR Charge | Ambit Charge | Difference |
|------|-------------|--------------|------------|
| 06/2020 | $6.01 | $10.52 | $4.51 |
| 07/2020 | $6.30 | $11.40 | $5.10 |
| 08/2020 | $6.55 | $11.47 | $4.91 |
| 09/2020 | $6.83 | $11.52 | $4.69 |
| 10/2020 | $6.46 | $10.78 | $4.32 |
| 11/2020 | $21.44 | $37.27 | $15.83 |
| 12/2020 | $34.34 | $59.19 | $24.84 |
| 01/2021 | $38.33 | $67.08 | $28.75 |
| 02/2021 | $45.63 | $78.67 | $33.04 |
| 03/2021 | $30.81 | $50.93 | $20.12 |
| 04/2021 | $31.10 | $44.57 | $13.47 |
| 05/2021 | $28.32 | $49.57 | $21.24 |

| Date | NICOR Charge | Ambit Charge | Difference |
|---|---|---|---|
| 06/2021 | $12.22 | $21.38 | $9.16 |
| 07/2021 | $10.00 | $17.49 | $7.50 |
| 08/2021 | $8.89 | $15.56 | $6.67 |
| 09/2021 | $10.01 | $17.51 | $7.50 |
| 10/2021 | $3.30 | $5.29 | $1.99 |
| 11/2021 | $40.66 | $68.63 | $27.97 |
| 12/2021 | $84.88 | $148.55 | $63.66 |
| 01/2022 | $100.46 | $186.21 | $85.75 |
| 02/2022 | $88.85 | $167.18 | $78.33 |

63.     As with Mr. Bochat, Mr. Simons' monthly charges for gas were ***significantly*** higher than he was promised under his original contract.  Over just 21 months, Ambit overcharged Mr. Simons $469.35, for total damages during this period—including the promised 1% discount—of $474.04.  And this period represents only a fraction of the period in which Mr. Simons received gas supply from Ambit.

64.     In direct breach of the Guaranteed Savings Contract, Ambit never paid Plaintiffs for the difference between its rates and 1% less than what the utility would have charged them.  Ambit's breach of its pre-2012 contract thus harms customers like Plaintiffs who were enrolled in the Guaranteed Savings Plan prior to 2012.

### Violation of Duty of Good Faith and Fair Dealing

65.     In the 2016 deposition in *Kostovetsky v. Ambit Energy Holdings, et al*, Ambit's then Co-CEO Chris Chambless admitted that Ambit's amendments to its 2012 Agreement were not due to changes in regulatory rules and requirements, applicable laws, or local utility tariffs.  His statements also demonstrate that the amendments were made in bad faith.

66.     When asked about Ambit's reasons for implementing the automatic default policy, Mr. Chambless stated that Ambit's "thought process" was that "it gave us an opportunity to talk to [customers] once a year and that if [customers] proactively acknowledge that they had to stay for 12 months to receive that savings guarantee, they might possibly stay longer. . . . our idea was that, when you ask a person to proactively say, Yes, I want to be here for 12 months, intuitively they're going to stay around longer than someone who didn't say that . . . ."

67.     Chambless' explanation is clearly disingenuous, as Ambit can "talk to" its customers whenever it wants, with or without an automatic default policy or an opt-in requirement for the Guaranteed Savings Plan.  Further, taking away a previously promised guarantee of 1% savings is not going to make customers "possibly stay longer."  In fact, if customers were adequately notified of either the opt-in requirement for the Guaranteed Savings Plan, or the cost of the Variable Plan they were being switched to and that plan's lack of a savings guarantee, they would have far more reason to *leave* Ambit rather than "stay longer."

68.     Mr. Chambless' statements further demonstrate Ambit's bad faith in amending its Agreement—not only did Ambit fail to give customers adequate notice of the automatic default provision, but according to Mr. Chambless, part of the purpose of the policy was to allow Ambit to ascertain which of its customers were intent on staying in the Guaranteed Savings Plan and to enable Ambit to "limit" the products available to those customers.

## V.     Ambit's Admissions of Liability in New York for its Automatic Default Policy

69.     On May 4, 2015, the New York State Public Service Commission's ("PSC") Department of Consumer Advocate announced that it was investigating Ambit due to allegations strikingly similar to those made by Plaintiffs here.  PSC Chief Executive Officer Audrey Zibelman

stated that the PSC was looking into "Ambit's practice of moving people off the guaranteed-savings plan into a variable rate plan that had significantly higher rates than the utility."

70. Unbeknownst to the consuming public, however, prior to the PSC's announcement, Ambit had already conceded to the PSC that its conduct had harmed consumers. In an April 1, 2015 letter to the PSC, Ambit Legal and Regulatory Compliance Attorney Patricia Zacharie stated that Ambit would refund "all impacted customers that the [PSC] complaint staff previously forwarded to Ambit in years 2014-2015 . . . ." Going forward, Ambit also promised to refund "any customer who files a new complaint with the [PSC] regarding having [been] rolled to the Select Variable Plan and who may not have received renewal correspondence." Ambit characterized these concessions as part of its commitment to "make all reasonable efforts to being fully compliant no later than June 30, 2015."

71. Ambit also agreed to send letters to "all" of its then current enrollees in the New York Select Variable Plan—which is essentially identical to the Illinois Select Variable Natural Gas Plan—and notify them that they could switch back to the Guaranteed Savings Plan and that every quarter Ambit would contact "all customers who roll off of GSP or remain on Ambit's [New York Select Variable Plan] to offer them the opportunity to switch to . . . Ambit's Guaranteed Savings Plan."

72. On May 18, 2015, Ms. Zacharie again wrote to the PSC, this time to provide an update on its efforts to "comply with its agreement with the [PSC] as set forth in [her] earlier letter April 1, 2015." In the letter Ms. Zacharie noted that Ambit had "mailed over 120,000 letters to all [New York] customers on the Select Variable Plan" encouraging them to sign back up for the Guaranteed Savings Plan. The letter also stated that it had "sent over 3,000 email and telephoned over 300 customers" who had been switched in the last 30 days and that it had "sent over 11,000

emails and [had] called nearly 600 customers" who had earlier been defaulted into the New York Select Variable Plan.

73.     These admissions demonstrate not only that Plaintiffs have an actionable claim and are likely to prevail on the merits, but also why this class action is so important for Ambit's Illinois customers.  While certain Ambit customers in New York received compensation for Ambit's overcharges, Ambit's customers in Illinois have yet to receive any kind of remedy.  Given that Ambit is not providing compensation to the Illinois customers harmed by Defendants' conduct, this case is ideally suited for class action treatment.

## CLASS ACTION ALLEGATIONS

74.     Plaintiffs bring this class action pursuant to pursuant to Fed. R. Civ. P. 23 on behalf of themselves and a Class for damages and injunctive relief.

75.     The Class is preliminarily defined as follows:

> All persons who received services from Ambit in the State of Illinois who were enrolled prior to Ambit's implementation of the Automatic Default Policy as a residential or small business/commercial customer of Ambit on any of Ambit's Guaranteed Savings Plans and who were subsequently switched from Ambit's Guaranteed Savings Plan to a different Ambit plan.

76.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class or to propose additional sub-classes as might be necessary or appropriate.

77.     Excluded from the Class are the officers and directors of Defendants, members of the immediate families of the officers and directors of Defendants, and their legal representatives, heirs, successors or assigns and any entity in which they have or have had a controlling interest. Also excluded are all federal, state and local government entities; and any judge, justice or judicial officer presiding over this action and the members of their immediate families and judicial staff.

78.     Numerosity:  Although Plaintiffs do not know the exact size of the Class (since such information is in the exclusive control of Defendants), the number of persons within the Class is substantial.  Plaintiffs believe that, based on the number of Ambit customers, the Class encompass tens of thousands of individuals whose identities can be readily ascertained from Defendants' records.  Accordingly, the members of the Class are so numerous that the joinder of all such persons is impracticable.

79.     Commonality and Predominance: There are well-defined common questions of fact and law that exist as to all members of the Class and that predominate over any questions affecting only individual Class members, and a class action will generate common answers to the questions below, which are apt to drive the resolution of this action.  These common legal and factual questions, which do not vary from Class member to Class member, and which may be determined without reference to the individual circumstances of any Class member, include, but are not limited to, the following::

a.  Whether Defendants breached the Agreement and their implied duty of good faith and fair dealing;

b.  Whether the Class members have been injured by Defendants' breach of contract; and

c.  Whether, and to what extent, equitable relief should be imposed on Defendants.

d.  The extent of class-wide injury and the measure of damages for those injuries.

80.     Adequate Representation:  Plaintiffs have retained and are represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation. Plaintiffs and their counsel are committed to vigorously prosecuting this class action. Moreover, Plaintiffs are adequate class representatives and are able to fairly and adequately represent and protect the interests of the Class. Their claims are typical of the claims of the Class and do not

conflict with the interests of any other members of the Class. Neither Plaintiffs nor their counsel have any interest adverse to, or in conflict with, the interests of the absent Members of the Class. Plaintiffs have raised viable claims of the type reasonably expected to be raised by Members of the Class, and will vigorously pursue those claims. Plaintiffs and the other members of the Class were subject to the same or similar conduct. Further, Plaintiffs and the Class sustained substantially the same injuries and damages arising out of Defendants' conduct. If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional Class representatives to represent the Class, additional claims as may be appropriate and/or to amend the Class definition.

81.     Superiority: A class action is an appropriate method for the fair and efficient adjudication of this case because the prosecution of separate actions by Class members will create a risk of inconsistent or varying adjudications and an unnecessary multiplicity of suits, and because as a practical matter, class members have no other avenue for legal redress. Maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each Member of the Class. Plaintiffs anticipate no difficulty in the management of this action as a class action.

82.     Accordingly, this action satisfies the requirements set forth under Fed. R. Civ. P. 23.

## CLAIM FOR RELIEF

### BREACH OF CONTRACT

83.     Plaintiffs repeat and reallege the preceding paragraphs as though set forth herein.

84.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class.

85. By moving Plaintiffs and Class Members into higher costing variable plans without contractual authorization, Ambit cheated Plaintiffs and Class members out of the 1% savings they were guaranteed as participants in the Guaranteed Savings Plan.

86. In relevant part, the "Amendments" section of Ambit's pre-2012 Agreement states: "Ambit reserves the right to amend or terminate this Agreement due to changes in regulatory rules and requirements, and all applicable laws," or the local utility's tariff. No such change occurred and therefore Ambit did not have the contractual authority to terminate the Guaranteed Savings Contract.

87. The "Amendments" section of the pre-2012 Agreement also states the following:

> If Ambit materially changes the provisions of this Agreement to the disadvantage of the Customer, Ambit Energy will provide 45 days notice prior to the effective date of such material change and provide the customer with 45 days to opt out of the new provisions at no cost, beginning on the postmarked date of the material change notice sent by Ambit Energy to the Customer. If the customer does not respond to the material change notice within the 45 days to notify Ambit Energy that it elects to opt out of this Agreement within the Customer opt out time period, this Agreement will continue in effect under the amended terms of service.

88. Defendants did not comply with the amendment provision of the Guaranteed Savings Contract, and thus there was no effective amendment to the Guaranteed Savings Contract, and thus Ambit breached the Guaranteed Savings Contract when it did not send customers a check for the difference between Ambit's rates and 1% less than the utility rates irrespective of whether they sent written notice to Ambit every year.

89. Plaintiffs and Class members were injured because Ambit did not send them a check each year for the difference between Ambit's rates and 1% less than the utility rates

90. All contracts contain an implied covenant of good faith and fair dealing, including Plaintiffs' and Class members' contracts with Ambit.

91. Defendants have breached the covenant of good faith and fair dealing implied in the Guaranteed Savings Contract with Plaintiffs and the Class by implementing the automatic

default policy and renewal requirement for the Guaranteed Savings Plan without any notice or justification.

92.　　Ambit's actions as alleged herein impede the right of Plaintiffs and other Class members to receive benefits that they reasonably expected to receive under their pre-2012 Agreement with Ambit.

93.　　Ambit's actions as alleged herein were performed in bad faith, in that the purpose behind the practices and policies alleged herein was to benefit Ambit at the expense of its customers and in contravention of their reasonable expectations as customers of Ambit.

94.　　By reason of the foregoing, Plaintiffs and the Class have suffered injury and money damages in an amount to be determined at the trial of this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, request that this Court enter judgment against Defendants and in favor of Plaintiffs and award the following relief:

(a)　　Certifying the proposed Class, appointing Plaintiff as Class representatives and appointing undersigned counsel as Class Counsel;

(b)　　Damages in an amount to be determined at trial;

(c)　　Pre- and post-judgment interest at the maximum rate permitted by applicable law;

(d)　　Attorneys' fees, costs, and expenses as available under the law; and

(e)　　Such other and additional relief as the Court may find just and equitable.

## JURY DEMAND

Plaintiffs demand a trial by jury on all causes of action so triable.

Dated: May 16, 2024       **LYNCH CARPENTER LLP**

By:     */s/ Katrina Carroll*
        Katrina Carroll
        111 W Washington St., Suite 1240
        Chicago, IL 60602
        Telephone: (312) 750-1265
        Fax: 773-598-5609
        katrina@lcllp.com

        *Local Counsel*

        **WITTELS MCINTURFF PALIKOVIC**
        J. Burkett McInturff*
        Nathan A. Rice
        305 Broadway, 7th Floor
        New York, New York 10007
        Telephone: (914) 775-8862
        nar@wittelslaw.com

        **FINKELSTEIN, BLANKINSHIP,**
        **FREI-PEARSON & GARBER, LLP**
        D. Greg Blankinship*
        One North Broadway, Suite 900
        White Plains, New York 10601
        Telephone: (914) 298-3281
        gblankinship@fbfglaw.com

        *Attorneys for Plaintiffs and the Proposed Class*

        *Admitted Pro Hac Vice*