# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| GREGG BOCHAT and PHILIP SIMONS, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br>    v.<br><br>AMBIT ILLINOIS, LLC, VISTRA CORP, and VOLT ASSET COMPANY, INC.,<br><br>        Defendants. | Case No. 1:24-cv-3116<br><br>Hon. Manish S. Shah |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT

## INTRODUCTION AND FACTUAL BACKGROUND

Plaintiffs' claims are as simple as they are compelling. To lure consumers away from getting their natural gas and electricity from local utilities, Defendant Ambit Energy[1] offered the "Guaranteed Savings Plan" as part of its customer contract. ECF No. 21, Amended Class Action Complaint ("Am. Compl.") at 3. Ambit's contract, which only terminated at the customer's election or for the customer's nonpayment, obligated Ambit to charge at least 1% less than the utility on an annual basis, or to send customers a check for the difference. *Id.* ¶ 5, Exs. A and B (Plaintiffs' contracts). When they signed up, customers like Plaintiffs were given no reason to suspect that they would not stay on the plan as long as they remained Ambit customers. *Id.* ¶ 51.

Realizing that honoring the Guaranteed Savings Plan would cut into profits, in 2012 Ambit concocted a scheme to quietly back out of its contractual savings guarantee. Ambit mailed innocuous and unnoticeable letters to its Guaranteed Savings Plan customers that unassumingly enclosed new fine print contracts. These new contracts included a new provision that would require Plaintiffs to take affirmative steps to ***opt in*** to the Guaranteed Savings Plan every year lest they be automatically switched to a more expensive pricing structure with no guaranteed savings (the "Variable Plan"). *Id.* ¶¶ 7, 47, Ex. C. Variable Plan rates are always higher than the comparable utility rate. *Id.* ¶¶ 60–63.

Fortunately, Ambit's bad faith attempt to deny its customers the benefit of the Guaranteed Savings Plan ran afoul of the original contract's binding amendment provision. *Id.* ¶¶ 9, 54–59. The original contract only allowed amendment "due to changes in" (1) regulation, (2) "applicable laws," or (3) "Nicor's Customer Select tariff." *Id.* ¶¶ 15, 54–56. No such changes had occurred. Instead, Ambit's Co-CEO ***admitted*** in sworn testimony that the new contract was for a different,

---

[1] All Defendants are referred to herein as "Ambit" or "Ambit Energy."

1

entirely spurious reason. *Id.* ¶¶ 15, 55–56, 65–68. Ambit also failed to satisfy the original contract's provisions for notifying customers of contract changes and their right to stick with the original contract. *Id.* ¶¶ 12, 17, 49, 56–59. Thus, under settled law and the contract's own express language, the original Guaranteed Savings Plan contract was never amended and remained in force until Plaintiffs canceled their service in 2015 and 2022, respectively. *Id.* ¶¶ 11–13, 24–30. Ambit breached that contract each year it failed to make good on its promise to charge rates that were at least 1% less than the utility or to send a check for the difference. *Id.* ¶¶ 10, 88.

## **ARGUMENT & AUTHORITIES**

**I.    AMBIT BREACHED EACH YEAR IT DID NOT CHARGE AT LEAST 1% LESS THAN THE UTILITY OR SEND A CHECK FOR THE DIFFERENCE.**

Ambit's claim that it did not breach the original contracts turns entirely on its argument that the new contracts it discreetly mailed in 2012 replaced the original contracts. This contention is flatly refuted by the original contracts' plain terms, and it is precluded by Illinois law.

### **A.  The Original Contract's Amendment Provision Precludes Ambit's Claim That It Had Carte Blanche To Amend "For Any Reason."**

The original contract's amendment provision specifically allows for amendments "due to" only three identifiable categories of "changes," all of which are outside of Ambit's control: "Ambit reserves the right to amend or terminate this Agreement due to changes in regulatory rules and requirements, and all applicable laws, or Nicor's Customer Select tariff." Am. Compl. ¶ 54; *see also id.* Exs. A–B (identical "Amendments" sections). Yet, "[n]o such changes occurred." *Id.* ¶ 54. Ambit claims it could amend the agreement whenever and however it wanted, pointing to the provision that allows Ambit to "amend this Agreement at a ***later date***" as opposed to upon the occurrence of one of the amendment provision's three listed "changes." ECF No 25, Defs.' Mot. to Dismiss ("Def. Br.") at 9–10. But this is just a timing provision giving Ambit flexibility as to ***when*** amendment would happen and clarifying that Ambit did not have to act immediately

2

following the occurrence of one of the three enumerated "changes." Ambit's assertion that this timing provision gave it an "unqualified" right to amend "for any reason" completely ignores the contract's plain language. *Id.* at 9–10.

Ambit's reading also disregards multiple cannons of contract construction. ***First***, "[t]he Court must construe the words of a contract within the context of the contract as a whole. The Court does not view portions, terms, clauses, or language in the contract in isolation, but rather views each provision in light of its context within the entire document." *Darvosh v. Lewis*, 66 F. Supp. 3d 1130, 1135–36 (N.D. Ill. 2014) (citations and quotation marks omitted).

Here, Ambit's supposedly "unqualified" text follows the express limitation that amendment is only permitted "due to changes in regulatory rules and requirements, any applicable laws, or Nicor's Customer Select tariff." With this context, it is clear the language Ambit cites merely relates to the amendment's ***timing***, not the ***grounds*** for it. Indeed, if Ambit's right to amend were unqualified, there would be no reason for the contract to specify a right to amend "due to" three identifiable categories of "changes." *See GNB Battery Techs., Inc. v. Gould, Inc.*, 65 F.3d 615, 622 (7th Cir. 1995) ("A contractual interpretation that gives reasonable meaning to all of the terms in an agreement is preferable to an interpretation which gives no effect to some terms.").

***Second***, as a form contract Ambit drafted, it must be construed against Ambit. *See Stampley v. Altom Transp., Inc.*, 958 F.3d 580, 586 (7th Cir. 2020). ***Third***, and as discussed below, the implied covenant of good faith and fair dealing blocks Ambit's unorthodox reading of the contract's amendment provision.

***Fourth***, even if Ambit were correct that "at a later date" supplied grounds for amendment, those grounds are limited by the specific provision referencing three categories of changes outside of Ambit's control. The canon of *ejusdem generis*, which "seeks to clarify a broad or general term

3

by looking to the specific items preceding that term for clues as to how that term should be construed," makes this clear. *Citizens Ins. Co. of Am. v. Wynndalco Enterprises, LLC*, 70 F.4th 987, 999 (7th Cir. 2023). Where, as here, "general words follow specific words . . . , the general words are usually construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Id.* (quoting *Yates v. United States*, 574 U.S. 528, 545 (2015)) (alteration in original). In other words, "if the general words were given their full and ordinary meaning, the specific words would be superfluous as encompassed by the general terms. If the drafter had meant the general words to have their unrestricted sense, it would not have used the specific words." *Id.* (cleaned up). Far from incontrovertibly contradicting Plaintiffs' reading, the amendment provision precludes Ambit's defense. *See Williams v. State Farm Mut. Auto. Ins. Co.*, 609 F. Supp. 3d 662, 673 (N.D. Ill. 2022) (refusing to dismiss claim based on contracts attached to motion to dismiss because they did not "irrefutably disprove" the plaintiff's claims).

### B. Ambit's Summary Judgment Defense Regarding Its Notices Is Flawed And Premature.

The amendment provision makes clear that "[i]f Ambit materially changes the provisions of this Agreement to the disadvantage of the Customer," Ambit must mail a "material change notice" and allow the customer to "opt out" of the new terms "at no cost." Am. Compl. ¶ 56. If the customer does "not respond to" that "material change notice," the amendment takes effect. *Id.* Failure to comply with the notice provision voids the purported amendment. *See, e.g.*, *Glikin v. Major Energy Elec. Servs. LLC*, 2022 WL 17366626, at *1 (2d Cir. Dec. 2, 2022) ("'[W]here a party voluntarily included a notice of changes provision in a customer agreement it authored . . . ,' the authoring party's failure to comply with the notice provision cannot establish a valid contractual modification.").

4

Plaintiffs plausibly allege that Ambit did not comply with these notice provisions. *First*, Ambit did not provide "a material change notice" when it tried to swap out the original contract because its "mailer appeared as junk mail," *id.* ¶ 57, and "the mailers containing the alleged terms of service were designed to ensure that customers did not read or notice the renewal term or the amended Agreement," *id.* ¶ 17. The only mention of the new requirement to affirmatively opt into the Guaranteed Savings Plan was "buried" within "the three-page form contract" enclosed within the mailer. *Id.* ¶ 58. *Second*, the letter Ambit put in the mailer with the form contract was also not a "material change notice" because it did not disclose that *any* material change was being made, much less identify the specific material change afoot—one that would force customers to take action each year to enjoy the Guaranteed Savings Plan benefits for which they had contracted. *Id.* ¶ 57; *see also* ECF Nos. 25-1, 25-2. The letters "did not even contain the words 'change' or 'amendment,' much less 'notice of a material change.'" *Id.* ¶ 57. *Third*, the letters did not disclose that the customer had "45 days to opt out of the new provisions at no cost." *Id.*

Ambit mounts two responses to these detailed allegations. *First*, Ambit claims that forcing customers to affirmatively opt in to keep a benefit for which they had previously contracted is not a material change. Def. Br. at 11. To state Ambit's argument is to refute it. The Complaint alleges that "Ambit knew that the purported amendment would be material because it estimated that 65% of its customers would not send written notice for renewal, resulting in tens of millions of dollars in additional payments to Ambit for the same exact commodity (gas and electricity)." Am. Compl. ¶ 14. Given that the Variable Plan rates were "much higher than the utility rates," the new "unauthorized amendment" caused "materially increased rates for a significant majority of customers on the Guaranteed Savings Contract." *Id.* Depriving customers of the guaranteed savings they were promised unless they opt back in each year is clearly material.

5

In fact, a New York court assessed the same amendment attempt at issue here and found that these same allegations could constitute a "material change" under a New York law requiring Ambit to obtain customers' written consent to any material changes to its customer contract. *Simmons v. Ambit Energy Holdings, LLC*, 2016 WL 6189014, at *9 (N.Y. Sup. Ct. Oct. 19, 2016). That court found that "switch[ing] Plaintiffs from a rate plan that contained a guaranteed 1% savings over what they would pay with a traditional utility to a rate plan that contained no such guarantee and, in fact, charged more," could constitute a "material change" under the statute. *Id.*

Nevertheless, Ambit conflates the concept of a "material" contract term with the contract's straightforward requirement that customers be notified "[i]f Ambit materially changes the provisions of this Agreement to the disadvantage of the Customer." Def. Br. at 11. In other words, Ambit argues that notice is only required if it changed a *material term*, and that Ambit could not find caselaw supporting "the proposition that a renewal provision is material." *Id.* That is simply not what the contract says. Instead, the contract's plain language references "material changes" to *any* contract provisions that are "to the disadvantage of the Customer." *See* Black's Law Dictionary (11th ed. 2019) (defining "material," as relevant here, as "[o]f such a nature that knowledge of the item would affect a person's decision-making; significant; essential"). Ambit's proposed changes were clearly material and to the disadvantage of its customers.[2]

**Second**, Ambit mounts the factual defense that the "mailers enclosing renewal notices and amended contracts were sufficient." Def. Br. at 11. That is the stuff of summary judgment. In

---

[2] Because Ambit misreads the contract, its case law regarding material contract terms is inapposite. Moreover, Ambit cites 220 ILCS 5/16-115, which does not contain the language its brief quotes. Def. Br. at 11. Plaintiffs assume Ambit meant to cite 220 ILCS 5/19-115, which is equally unavailing. That statute requires that third-party verification **calls** and oral enrollment **call recordings** disclose, *inter alia*, "the price of the service to be provided and the material terms and conditions of the service being offered, including whether any early termination fees apply." 220 ILCS 5/19-115(c)(2)(F). Ambit stretches the statute too far when it claims that the statute somehow means that "price" and "whether any early termination fees apply" are the *only* material contract terms. As noted above, however, Ambit's argument is a red herring.

fact, while Ambit's brief attached the letter *inside* its mailer (ECF Nos. 25-1, 25-2), Ambit does not attach the envelopes Plaintiffs allege "appeared as junk mail," Am. Compl. ¶ 57, and were "designed to ensure that customers did not read or notice the renewal term or the amended Agreement," *id.* ¶ 17; *see also, e.g.*, *Rhoades v. Penn-Harris-Madison Sch. Corp.*, 574 F. Supp. 2d 888, 891 (N.D. Ind. 2008) ("[T]he court believes that a fact finder could conclude that the "Kingsman Notes" would be treated as "junk mail" in many households and quickly thrown out."). While it is true that the "narrow" exception "permitting the Court to consider documents on a Rule 12(b) motion" is intended for cases "interpreting" a contract, that is not what Ambit asks the Court to do here. *Williams*, 609 F. Supp. 3d at 674. Instead, Ambit combines factual claims about envelopes not in the record with its efforts to spin cover letters attached to its dismissal brief. But the "narrow" exception "is not intended to grant litigants license to ignore the distinction between motions to dismiss and motions for summary judgment." *Id.* (quoting *Hardiman v. Lipnic*, 455 F. Supp. 3d 693, 701 (N.D. Ill. 2020) (collecting cases)).

C. **Plaintiffs' Implied Covenant Allegations Are Not A Separate Theory Of Breach.**

Ambit tries to contort the original contract's amendment and notice provisions to excuse its failure to honor its savings guarantee. The implied covenant blocks Ambit's distortions. *See In re VTech Data Breach Litig.*, 2017 WL 2880102, at *9 (N.D. Ill. July 5, 2017) (Shah, J.) ("The implied covenant is used to interpret a contract."). For example, the implied covenant precludes Ambit's arguments that the contract allowed it to amend for any reason, that its new contract was not a "material change," and that Ambit's mailers were material change notices. A good faith construction of the contract precludes all of Ambit's interpretations.

Because Ambit misconstrues Plaintiffs' allegations, its arguments and cases are inapposite. For example, Ambit argues that "Plaintiffs have not pleaded any ambiguity in their contracts because none exists." Def. Br. at 13. But Ambit's own theory of the case shows why the implied

7

covenant constrains Ambit's (mis)reading of the contract. Ambit's claim that Plaintiffs are asking the Court to "ignore the express contractual term[s]" and "belatedly determine that the amendment was not allowed in the name of equity" must also be rejected because Plaintiffs make no such argument. In fact, Plaintiffs are attempting to enforce the contract's express terms, and the implied covenant of good faith supports Plaintiffs' efforts here.

## II. PLAINTIFFS' CLAIMS WERE TIMELY BROUGHT.

There are three reasons why Plaintiffs' claims are timely. ***First***, each time Ambit failed to make the required yearly payments, it breached a continuous and recurring obligation; each such breach created a separate cause of action with its own limitations period. ***Second***, the discovery rule tolled Plaintiffs' claims. ***Third***, under 735 ILCS 5/13-206, Plaintiffs' claims were tolled until they made their last monthly payment to Ambit.

### A. Each Violation Of Ambit's Continuous Obligation To Send Yearly Checks Created A New Cause Of Action.

Because the original contracts were always in force, and because Ambit always charged more than the utility, Ambit had a continuous and recurring obligation to send Plaintiffs a yearly refund check. Under Illinois law, it is well settled that when a contract imposes a continuing obligation to perform recurring actions (such as making payments over time), a new cause of action arises each time that obligation is breached. Plaintiffs can thus recover each missed yearly payment for the last 10 years—the limitations period for breach of written contracts in Illinois.

As the Seventh Circuit has explained:

> Contracts requiring continuous performance are capable of being partially breached on numerous occasions. Each partial breach is actionable and is subject to its own accrual date and own limitation period. Accordingly, because each breach of a continuous duty has its own accrual date, a plaintiff may sue on any breach which occurred within the limitation's period, even if earlier breaches occurred outside the limitation period.

8

*Hi-Lite Prods. Co. v. Am. Home Prods. Corp.*, 11 F.3d 1402, 1408–09 (7th Cir. 1993) (quoting 4 Corbin on Contracts § 956 at 841 (1951)); *see also Luminall Paints v. LaSalle Nat. Bank*, 581 N.E.2d 191, 194–95 (Ill. App. Ct. 1991); *Thread & Gage Co. Inc. v. Kucinski*, 451 N.E.2d 1292, 1296–97 (Ill. App. Ct. 1983).

It is thus well settled that breaching a periodic payment obligation creates a new cause of action and limitations period. *See, e.g.*, *Skinner v. Shirley of Hollywood, Div. of Nat'l Corset Supply House*, 723 F. Supp. 50, 54 (N.D. Ill. 1989) ("[W]hen a money obligation is payable in installments, the statute of limitations begins to run against each installment on the date it becomes due . . . . [T]he statute of limitations for all potential harm should not begin to run immediately upon the initial breach; the extent of future harm could vary or cease completely depending on the extent of the defendant's later wrongful conduct . . . . Each successive failure by [defendant] to pay commissions was tantamount to a separate cause of action for which the limitation period did not begin to run until payment became due.").[3]

Ambit's failure to pay in prior years does not relieve its failures in later years. *See Akhtert v. D'avis*, 2013 WL 3213078, at *3 (Ill. App. Ct. June 21, 2013) ("We also reject the defendants' argument that by failing to make any payments after October 2004 and never provid[ing] an accounting, they had clearly repudiated the contract as of December 2004. [I]n *Thread & Gage Co.*, the buyer never made any of the installment payments and expressly informed the seller that no payments would be forthcoming. Nonetheless, the reviewing court determined that the installment payment rule applied.").

---

[3] *See also Luminall*, 220 Ill. App. 3d at 802 (relying on "the well-established rule that where an obligation is payable by installments, the statute of limitations runs against each installment from the time it becomes due."); *Thread & Gage*, 116 Ill. App. 3d at 184 (same).

Ambit claims that any breach occurred in 2012 when it tried to swap out the original contract. Def. Br. at 6–7. But the Complaint snippets Ambit cites allege no such thing. Rather, the cited paragraphs merely show why Ambit did not effectively amend the original contract. Am. Compl. ¶¶ 47, 49, 57. The Complaint clearly alleges that the breach occurred when Ambit failed to send yearly reimbursement checks: "Ambit breached the Guaranteed Savings Contract every year by failing to write checks to its customers on the Guaranteed Savings Plan for the difference between Ambit's variable rate and 1% less than what the utility would have charged." *Id.* ¶ 10; *see also id.* ¶ 88 (same). None of Ambit's cases are on point because none concern a recurring and continuous obligation but rather discrete breaches about which the plaintiff was well aware.[4]

### B. The Discovery Rule Tolled Plaintiffs' Claims.

It is well-settled that "the 'discovery rule' . . . 'delays the start of the relevant statute of limitations until the claimant knows or reasonably should have known of the injury and that the injury was wrongfully caused.'" *United States ex rel. Morgan v. Champion Fitness, Inc.*, 368 F. Supp. 3d 1198, 1212 (C.D. Ill. 2019) (applying discovery rule to contract claim and denying motion to dismiss).[5]

Here, Plaintiffs plead that they did not know they had a claim before terminating their Ambit service less than ten years before filing this action: "Ambit did everything it could to ensure

---

[4] Ambit also argues that Plaintiffs needed to file a declaratory judgment action for a declaration that the "amended contracts" are void rather than voidable. Def. Br. at 8. This argument makes too much of Plaintiffs' allegation that the "amended contracts" were *void ab initio*. Am. Compl. ¶ 11. Plaintiffs merely allege that the "amended contracts" were never in force. Not surprisingly, all of Ambit's cases are inapposite because they all involve scenarios where the parties contracted and then one party later brought a declaratory action to void those agreements. Def. Br. at 8. None of Ambit's cases hold that a party must bring a declaratory judgment action before contesting that an original contract was not amended or superseded by a later writing.

5 *See also United Lab'ys, Inc. v. Savaiano,* 2007 WL 4162808, at *3 (N.D. Ill. Nov. 19, 2007) (denying motion to dismiss on limitations grounds where one party argued that the opposing party "presented no cases in which the discovery rule was applied to a breach of contract claim. *Hermitage*, however, is just such a case"); *B. Braun Med., Inc. v. Hospira, Inc.*, 2013 WL 12618931, at *2 (N.D. Ill. Mar. 13, 2013) (denying motion to dismiss contract claim on limitations grounds).

10

that its customers did not in fact notice that it was attempting to deprive them of the core benefit of the Guaranteed Savings Contract by instituting the automatic default policy." Am. Compl. ¶ 59; *see also id.* ¶ 17 ("[T]he mailers containing the alleged terms of service were designed to ensure that customers did not read or notice the renewal term or the amended Agreement."); *id.* ¶¶ 49–50 (same); *id.* ¶¶ 57–58 (same). Plaintiffs neither knew nor reasonably should have known in 2012 that they then had a right to sue. Plaintiffs also plausibly allege that they neither knew nor reasonably should have known that Ambit owed them a reimbursement in any particular year: "it is extremely difficult for consumers, including Plaintiffs, to compare Ambit's prices with what their local utility would have charged. No consumer, including Plaintiffs, would know, even through the exercise of due diligence, that Ambit charged them more than 1% less than the utility rates over the course of any particular year." *Id.* ¶ 20.

> As the Seventh Circuit has repeatedly held:
>
> "Dismissing a complaint as untimely at the pleading stage is an unusual step, since a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations." "Further, these defenses typically turn on facts not before the court at that stage in the proceedings." . . . As long as there is a conceivable set of facts, consistent with the complaint, that would defeat a statute-of-limitations defense, questions of timeliness are left for summary judgment (or ultimately trial), at which point the district court may determine compliance with the statute of limitations based on a more complete factual record.

*Sidney Hillman Health Ctr. v. Abbott Labs., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015) (citations omitted). Because there is a set of facts Plaintiffs can prove that defeats Ambit's limitations defense, dismissal is inappropriate. *See Bryant v. Walgreen Co.*, 2023 WL 5580415, at *5 (N.D. Ill. Aug. 29, 2023) (Shah, J.) (denying dismissal motion because the plaintiffs "have not alleged facts that indicate when they had reason to know their notification rights were violated"); *Carbone v. Brown Univ.*, 621 F. Supp. 3d 878, 891 (N.D. Ill. 2022) (Shah, J.) (sustaining contract claim and holding that "[t]he plaintiffs do not have the burden of pleading that an exception to a possible

11

affirmative defense applies; rather, the defendants have the burden, on a Rule 12(b)(6) motion, to show that there is no 'conceivable set of facts, consistent with the complaint'").

### C. Plaintiffs' Claims Were Tolled Until They Made Their Last Payments To Ambit.

Illinois's statute of limitations for written contracts includes a mandatory tolling period lasting until the last payment is made on the contract at issue:

> [A]ctions on . . . written contracts . . . shall be commenced within 10 years next after the cause of action accrued; but if ***any payment*** or new promise to pay has been made, in writing, on any bond, note, bill, lease, contract . . . ***within or after the period of 10 years***, then an action may be commenced thereon at any time within 10 years after the time of such payment or promise to pay.

735 ILCS 5/13-206 (emphases added); *see also Legat v. Legat Architects Inc.*, 2022 WL 2289295, at *6 (Ill. App. Ct. June 24, 2022) ("[T]he 10-year statute of limitations applicable to written contracts includes an express tolling provision, whereby any payment made pursuant to a written agreement tolls the applicable limitations period."). As this Court recently held, "any payment" encompasses the last payment by the plaintiff:

> Under . . . 735 ILCS 5/13-206, [the plaintiff] had ten years from the date of her final payment to defendants to file her claim . . . . [She] alleges that . . . her final payment under the agreement [was] on March 5, 2012, and that she filed her complaint within ten years after that payment. . . . Plaintiff has alleged a conceivable set of facts, consistent with the complaint, that would defeat that statute-of-limitations defense, so issues of timeliness are left for summary judgment or trial.

*Pierce v. Wilner*, 2021 WL 4634669, at *3 (N.D. Ill. Oct. 7, 2021) (Shah, J.).

Because Mr. Bochat made his last Ambit payment in 2015, and Mr. Simons paid last in 2022, their claims are timely. *See Oechsle v. Pickus*, 1995 WL 430946, at *3 (N.D. Ill. July 18, 1995) ("Plaintiffs and defendants entered into a contract which provided for monthly payments continuing until January 1, 2004, or until payment of the purchase price. Plaintiffs made the last payment on March 5, 1987. Hence, in applying the ten-year statute of limitations, plaintiffs had until March 5, 1997, to bring their action for breach of contract.").

**III. AMBIT'S WAIVER DEFENSE IS BOTH PREMATURE AND INCORRECT.**

Ambit next seeks dismissal based on an unpled affirmative defense of waiver. However, Ambit "has the burden to prove that [Plaintiffs] impliedly waived [their] right in a 'clear, unequivocal, and decisive' manner." *Bd. of Trs. of Harvey Firefighters' Pension Fund v. City of Harvey*, 96 N.E.3d 1, 43 (Ill. App. Ct. 2017) (rejecting waiver where the plaintiff had not done calculations needed to determine whether the defendant breached the contract). Nothing in the Complaint supports the claim that Plaintiffs were even aware that Ambit was shirking its 1% savings guarantee, much less that they intentionally released Ambit from its obligation to send annual checks. There are at least two reasons why Ambit's waiver defense lacks merit.

*First*, Ambit's waiver claim is an unpled affirmative defense. *See Nadeem v. Viscosity Oil Co.*, 2021 WL 4318094, at *4 (N.D. Ill. Sep. 23, 2021) ("A Rule 12(b)(6) motion addresses whether a plaintiff has met the pleading standard in her allegations, not whether she has sufficiently alleged facts in anticipation of affirmative defenses. This Court will not grant Defendant's Rule 12(b)(6) motion to dismiss based upon the purported merits of an affirmative defense. Because Plaintiff has otherwise satisfied the pleading requirements, the Court denies Defendant's motion to dismiss." (citing *Brownmark Films LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012))); *see also S.C. Johnson & Son, Inc. v. Transp. Corp. of Am., Inc.*, 697 F.3d 544 (7th Cir. 2012) ("[P]laintiffs have no duty to anticipate affirmative defenses.").

*Second*, there is nothing in the Complaint supporting waiver. To the contrary, Plaintiffs allege they knew neither that Ambit owed them reimbursements, Am. Compl. ¶ 20, nor that Ambit had instituted the automatic default policy. *Id.* ¶¶ 17, 49–50, 57–59. Plaintiffs could not have knowingly and intentionally relinquished their right to recover for breaches of which they were unaware. *See Levin v. Grecian*, 974 F. Supp. 2d 1114, 1126 (N.D. Ill. 2013) (rejecting waiver because "[i]f [the plaintiff] did not know that [the defendant's] inaction was potentially a material

13

breach, then he could not have knowingly waived his right to assert that breach"). Nor is Plaintiffs' mere silence sufficient to prove waiver. *See Spiegel v. 1618 Sheridan Rd. Condo. Ass'n*, 2022 WL 802146, at *7 (Ill. App. Ct. Mar. 16, 2022) (a defendant "cannot rely on supposed inaction and must demonstrate that there was a clear, unequivocal and decisive act or a course of action that indicated the [plaintiff] was relinquishing its legal rights").

That Plaintiffs made payments after Ambit claims they knew it would not honor the Guaranteed Savings Plan is similarly insufficient at the pleading stage. *See Servicios Technologicos De Guat. v. Woccu Servs. Grp.*, 2014 WL 3845854, at *6 (W.D. Wis. Aug. 5, 2014) (though the defendant "may potentially be able to prove that [the plaintiff] has waived its claims for breach of contract by . . . making voluntary payments despite [the defendant's] alleged breach . . . [, it] is [not] grounds for granting a Rule 12(c) motion . . . [because] the need for more fact-intensive inquiry makes these issues best left for summary judgment.").

Ambit claims Plaintiffs waived their right to enforce the original contracts when they allegedly accepted and assented to the 2012 amended contracts. Def. Br. at 15. But, as discussed above, Ambit ran roughshod over the original contract's amendment provisions, including express provisions regarding notice. Ambit's reliance on *Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F.3d 705, 713–14 (7th Cir. 2019), is thus misplaced as there the defendant *did* comply with the prior contract's amendment provision *and* it provided adequate notice of the new amendments.

*Leon's Auto Sales, Inc. v. Leedom & Assocs., LLC*, 2015 WL 4978696 (N.D. Ill. Aug. 19, 2015), applying Florida law, is also inapposite as that case did not involve a pre-existing contract. *Id.* at *2. Here, Plaintiffs already had a contract with Ambit. Merely paying their bills as previously agreed is not acquiescence to the "amended contract." Ambit cites no cases under Illinois law or otherwise that support the notion that making payments under an existing contract

14

constitutes acquiescence to a new contract gratuitously sent by the other party, except where that party has complied with amendment provisions in the original contract.

Nor are Ambit's other cases on point. In *Board of Library Trustees v. Board of Library Trustees*, 34 N.E.3d 602 (Ill. App. Ct. 2015), the court cited the elements of waiver, but did not apply them or find waiver. *Id*. at 614. Moreover, the party against whom waiver was asserted accepted payments (rather than making them) the amount of which it calculated itself, and it "affirmatively adopted a construction of the contracts it now disclaims." *Id.*

Ambit's citation of *Roppo v. Travelers Commercial Insurance Co.*, 869 F.3d 568, 594–95 (7th Cir. 2017) is odd. There, the court rejected the waiver argument because the party against whom waiver was asserted did nothing more than comply with its obligations. In *Anderson v. Catholic Bishop of Chicago*, 759 F.3d 645, 651 (7th Cir. 2014), cited in *Roppo*, the court also rejected a waiver defense, as did the court in *Woods v. American General Life Insurance Co.*, 2023 WL 3172616, at *6 (N.D. Ill. May 1, 2023).

The Illinois Supreme Court has long cautioned against the dangers of waiver defenses:

> We agree with Consumers that finding a waiver in these circumstances would set a dangerous precedent. It would allow a party to a contract to succeed in shirking its contractual responsibilities unless and until the other party to the contract notices the defect in performance. Parties could no longer trust one another to carry out their obligations but instead would be forced to check on one another at each step of the project in order to avoid waiving benefits due them under the contract. Such a situation would only serve to obstruct and complicate business relationships.

*Batterman v. Consumers Ill. Water Co.*, 634 N.E.2d 1235, 1236–37 (Ill. 1994). This Court should not place the onus on consumers to investigate corresponding utility rates to be sure that Ambit was not shirking its contractual duty. Finding waiver here would signal to Ambit and other sellers that they need only honor their contracts when consumers catch them in breach.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask that the Court deny Defendants' Motion to Dismiss.

Dated: June 26, 2024　　　　　　　　　　**LYNCH CARPENTER LLP**

　　　　　　　　　　By:　*/s/ Katrina Carroll*
　　　　　　　　　　　　Katrina Carroll
　　　　　　　　　　　　111 W Washington St., Suite 1240
　　　　　　　　　　　　Chicago, IL 60602
　　　　　　　　　　　　Telephone: (312) 750-1265
　　　　　　　　　　　　Fax: 773-598-5609
　　　　　　　　　　　　katrina@lcllp.com

　　　　　　　　　　*Local Counsel*

　　　　　　　　　　**WITTELS MCINTURFF PALIKOVIC**
　　　　　　　　　　J. Burkett McInturff*
　　　　　　　　　　Nathan A. Rice
　　　　　　　　　　305 Broadway, 7th Floor
　　　　　　　　　　New York, New York 10007
　　　　　　　　　　Telephone: (914) 775-8862
　　　　　　　　　　nar@wittelslaw.com

　　　　　　　　　　**FINKELSTEIN, BLANKINSHIP,**
　　　　　　　　　　**FREI-PEARSON & GARBER, LLP**
　　　　　　　　　　D. Greg Blankinship*
　　　　　　　　　　One North Broadway, Suite 900
　　　　　　　　　　White Plains, New York 10601
　　　　　　　　　　Telephone: (914) 298-3281
　　　　　　　　　　gblankinship@fbfglaw.com

　　　　　　　　　　*Attorneys for Plaintiffs and the Proposed Class*

　　　　　　　　　　**Admitted Pro Hac Vice*